The next case for argument, FAT Brands Inc. v. Wesley Rumgeek and Nicky Edison. Good morning, Your Honors. Russell Bogart from Kagan, Kasperson & Bogart, PLLC on behalf of the appellant, FAT Brands Inc. The appellees Christina Fields, SJ Global Investments, Worldwide, Ltd., SJ Global Investments, Ltd., Peter Samuel, and Neil Walsh have not filed any briefs before this appellate court to dispute the allegations that they were involved in a civil conspiracy to commit fraud. Accordingly, we rely upon our briefs as to those groups of defendants, and we'll move on to first addressing the arguments pertaining to Nicky Edison and then the two claims as to Wesley Rumgeek. FAT Brands asks that the fraud claim against Nicky Edison be reinstated because the elements of personal jurisdiction and the substantive fraud elements are satisfied based upon Mr. Edison's participation in a conspiracy with the other SJ Global defendants. On appeal, Mr. Edison does not dispute that the PPMT defendants defrauded FAT Brands. In fact, the lower court believes so as well, that the other SJ Global defendants conspired with each other and the PPMT defendants, and that the other SJ Global defendants intended for their fraudulent representations to be communicated to FAT Brands. Instead, Mr. Edison's argument is that there are insufficient allegations in the complaint to allege that he was a member of this conspiracy, that he participated in this conspiracy, that the allegations of the conspiracy are based upon hearsay, and that they fail to comport with Rule 9b. First, factually, I'd like to establish that the best evidence of Mr. Edison's participation in the conspiracy is when FAT Brands finally had an opportunity to meet the SJ Global folks on January 29th in Zurich. Now, obviously, this event led to the conspiracy unraveling, but that event provided the first look behind the curtain as to what SJ Global was about, how it operated, and who its members were. Can I ask, one of the things that I'm still trying to get my head around about this conspiracy, because you're talking about unraveling at that meeting, is you had PPMT and then you had SJ Global, and as you've described them, it was a single conspiracy. And I'm trying to figure out, I understand why PPMT had an interest in misrepresenting their access to funding. They wanted to find a deal somewhere. They wanted to buy time to get somebody with money. I don't understand what the theory is as to SJ Global's motive to conspire with PPMT to pretend like they have the money when they don't, versus them having their own conspiracy to try to cut him out, which is what happened at that meeting. Well, conspirators may not be able to trust each other, just like pirates, but that doesn't mean that they weren't conspiring with each other, Your Honor. SJ Global had the same motivations that PPMT did. What was the ultimate objective of the criminal conspiracy and how they were going to profit from it? Because it was aborted or discovered, it never came to fruition, but we think the idea is that they were going to try and find somebody else to find the funding, maybe to damage the value of the company. There was concerns, ultimately this is hindsight, that maybe this was going to be a money laundering scheme, that improper funds were going to be used to purchase it and then they'd get back clean funds. There was also concern that this may be – typically these schemes are a confidence scheme. We have $100 million waiting for you in the bank account, and if you give us $3 million to convert it to euros, then we'll release it to you. How precisely PPMT or SJ Global was going to benefit from that, we don't know, but they clearly made fraudulent misrepresentations. I mean Mickey Edison posed during this meeting in Zurich as the trustee of a $50 billion trust, and at no point during all this litigation has anyone ever said that this trust actually existed. That was a clear misrepresentation, and that shows his participation in the fraud. Is there reliance though? What is the evidence of reliance? Didn't some of these comments you're pointing to happen after the point where the deal had already been past the deadline for when it was supposed to close? And so what is the evidence of reliance on these comments? That shows that Mickey Edison was part of the conspiracy along with the email that Mr. Douglas sent the next day congratulating Mr. Edison on the negotiations, saying he was the architect of it and that – talking about their involvement in the conspiracy back to October. But even if – And so if you show that he's a – I'm sorry. If you show that he's a member of the conspiracy and really was involved back until October, then all the acts of the conspiracy are imputable to all the co-conspirators. So by posing as a trustee of a $50 million trust that didn't exist, which was fraudulent, he's ratifying and assenting the full scope of the conspiracy. They didn't just find him on a corner at Starbucks right before this meeting and said pose as a $50 million – trustee of a $50 million trust. He was involved, and Douglas' email the next day, paragraph – I'm sorry. I think it's 203 to 205 of the amended complaint, 128 to 130 is the Zurich meeting, confirms – he says, Edison, you were involved dating back to October. So that, along with the overt acts by Mr. Edison and furtherance of the conspiracy, show that he was involved back in October and that he ratified these events by his participation in the conspiracy. Am I right then in understanding that – your argument is to Mr. Edison. I don't want us to say there's personal jurisdiction. He then falls into the bucket with SJ Global in terms of the merits and the analysis as to – Correct. Correct. The statement claim. And so the SJ Global analysis has two parts, right? It could either be the conspiracy with PPMT or it could be that, as the other SJ Global folks, it could be that they intended that PPMT relay their fraudulent misrepresentations. They met with Mr. Douglas in October in London. Mr. Douglas is saying we have a major legal problem here. I've been making all these misrepresentations to fat brands based upon your expressions to me that you have the wherewithal, intent, and ability, and you say who you are, and we have a major problem. We're all going to get sued. And they say, oh, don't tell them the same stuff, and this time we're going to buy $40 million in securities. And Douglas says exactly that to – so that doesn't involve a conspiracy at that point in time. And the allegation that Mr. Edison was in charge of the conspiracy is admitted in the Zurich meeting, and the email showing that he was saying that you were involved back until October ratifies all the other statements that they say are hearsay. And at that point, those statements would be verbal acts, declarations against interest, admissions, and so forth. So unless your honors have no further questions, I'll move on to Mr. Ramsey. Can I just ask you one question, which I guess pertains to both? So is there any relevance to the fact that the stipulated dismissal of prejudice with regard to, I guess, PPMT and Douglas and to the fact that that sort of – the fraud allegation as to those parties, those individuals is gone. Does that have any impact on these arguments in appeal that there's no actionable claim against those parties? No. We obtained a default judgment against PPMT. It wasn't a dismissal on the merits. And then we entered into a settlement agreement with PPMT and Carl Douglas based upon whatever we believed that we could collect at that point in time. So that is highly consistent with the merits of the claim. You mean to say that my action is inconsistent with a fraud by PPMT? Correct, correct. We think that the judgment reflects that there were valid claims. How did the district court miss this, the arguments that you're making? I guess we didn't have oral argument. The district court may not have believed – Didn't accept the – apparently didn't accept the conspiracy theory that you got. The district court focused more on the agency as opposed to the conspiracy issue, which is why we're here today. With respect to the defendant Wesley Ramgeet, FATBRANDS asked that the claim for negligent supervision against Mr. Ramgeet be reinstated. Based upon the special circumstances presented here, this court should find that claim to sufficiently allege that Mr. Ramgeet had a duty to supervise Mr. Douglas. He was – Douglas was his boss, right? No. I'm not sure about the relationship. Sure. So Wesley Ramgeet operated the PPMT family of companies. And Mr. Douglas was a contractor for Wesley Ramgeet and tried to muster up deals for him. You lent the name to Douglas. Carl Douglas? Did Ramgeet lend the name of the company? Mr. Douglas had a file for bankruptcy, so he couldn't do business as Carl Douglas. So Wesley said, okay, we'll create a PPMT capital company for you, and Ramgeet was the chairman of all the PPMT capital companies. But in what sense was he supervising you? He was the chairman of the companies. He was the – The companies, but what about the company? The company, he had the – he effectively acted like the board of directors. He had the ability to hire and fire Douglas. Because PPMT and capital existed solely because of Mr. Ramgeet's permission, he had the ability to say, I'm shutting this down today. Get out of the offices. You can't use the PPMT capital name anymore. It's over. He also was the CFO and treasurer, and so he controlled the bank accounts. So he effectively had complete control over what happened. It's in this Canosa v. Ziff case, the Southern District of New York, it's probably the case that's closest on point, said that there can be for officers or directors a duty to supervise and distinguish this Third Circuit case, Belmont v. MB, the MB investment partners, where the Third Circuit was concerned about imposing on directors or key officers a duty to supervise, rank and file employees. So this is the – you're making this argument on a theory of vicarious liability, I guess. Well – But I'm wondering – correct me if I'm wrong – Yeah. I'm wondering what actual knowledge Ramgeet had of the Ponzi – of the scheme. Well, I'm glad that you pointed out the vicarious liability point because we also rely on these state appellate courts that talk about a duty to supervise and uphold negligent supervision claims. And they say it's not simply vicarious liability, but it's where the supervisor allows for the activity to occur with knowledge as that it may cause harm, which is the second part of Your Honor's question. And here the knowledge is – You allow it to – just I want to be clear on it. Sure. The degree of culpability, if you will. Sure. Culpability, Ramgeet. You allow something to take place because you have a company and you've – people are acting in a certain way without your knowledge. I mean, and – but they're allowed to do it because, you know, they've got the vehicle for doing it. But I want to try and understand a little more about Ramgeet's personal responsibility. Ramgeet had personal knowledge, Your Honor. He – the complaint alleges that he had conversations on a regular basis with Carl Douglas and his assistant owner, Tatley Adam, about this, you know, hundreds – you know, multiple $100 million deals that SJ Global was going to introduce to the PPMT business. He attended a meeting with Fat Brands and Carl Douglas in which the meeting – you know, the circumstances were discussed. He – his company was going to serve as administrative agent, meaning it was going to take the funds. He controlled the funds. So he was copied on extensive amount of correspondence. Can I just – Given his sophistication, he should have been known that this presented red flags for fraud. It's a red flag case. It's not a direct knowledge of fraud. I – we haven't deposed him, so it's, you know. So can I just drill down a little bit on this relationship question? So you didn't plead an employer-employee relationship, which is typically required for negligent supervision. You raised the fact that there are circumstances – sometimes there can be special circumstances that are equivalent in some ways to employer-employee. But did you plead that kind of special relationship either? I think we did. And I just wanted to supplement my answer to his question and answer your question. Sure. Is – SJ Global was supposed to fund multiple deals for Fat Brands as alleged in the – for PPMT, rather, that's alleged in the complaint. And those deals never came in. So that should have also heightened Mr. Wesley Ramsey's suspicion. In terms of the special relationship, I don't have the complaint in front of me. But there are numerous – all the allegations that support the theory is in the complaint, that Wesley Ramsey operated the PPMT family of companies, that he was the CFO, treasurer in control of the money. He had the ability to terminate this enterprise. He stood to profit significantly if these $100 million deals actually were credible and came to fruition, which I think also is a strong factor. And all those facts are alleged in the complaint. Also, with respect to the issue of fault, the degree of fault, we also cite to several state appellate court decisions that I know this court and the Southern District Court disagree with this intermediate state appellate courts on the scope of the supervision claim. But the state appellate courts recognize restatement of agency section 357. And in the Connell v. Hayden decision, they say it's not strictly vicarious liability. You're in the – you're the supervisor, and therefore, you're liable. They say it requires a showing that Ramsey permitted Douglas's tortious conduct under circumstances that he should realize present an unreasonable risk of harm to others. And we think that we summarize those factors in the brief and in the reply brief. With respect quickly to the partnership issue, I know I'm past the time. It again, I think, presents a question in part on the difference between how the New York State Intermediate Appellate Courts and the Southern District Courts have been interpreting the losses requirement of the partnership test to determine if a partnership exists when there's no written agreement between two people conducting a business enterprise. There's, you know, New York State Intermediate Appellate Courts that read the Southern District decisions, and then they still say, you know, if there's no losses that are reasonably anticipated, that that element could be satisfied. And, you know, Southern District judges aren't convinced. And I'm sure your honors are very well versed in this disagreement. I just want to identify two quick factors that I think make this case a little bit distinguishable. Factor number one is in many of the other federal cases where ultimately they say we don't buy this, you know, argument adopted by the Intermediate Appellate Courts, State Appellate Courts. There were other factors that showed that there were fact losses anticipated. You know, people were suing because they had contractual obligations that weren't being honored. Those set of circumstances don't exist here. Mr. Ramsey doesn't identify a single contractual obligation that they, that wasn't being honored. I have an overly narrow understanding of the meaning of agree to share losses. I sort of interpret that in reading the cases as agree to be liable on each other's debts incurred in the context of the joint endeavor, which may or may not involve losses of money invested. It may involve things exactly like this suit. So if that's the case, then, you know, well, that leads to the second point is Carl Douglas was in bankruptcy. The entity had no income generating. It was essentially a boom or bust business. It was either going to generate millions of dollars from hundreds of millions of dollars to be invested by S.J. Global or it was going to be a complete bust. So the only person who could potentially make good on these losses, however the losses is interpreted, is Wesley Ramsey. And that was the second factor is that Ramsey set up this enterprise. They referred to themselves, or Douglas referred to him as his partner. And, you know, Ramsey knew that Douglas couldn't pay. He knew that PPMT Capital had no income unless it, you know, hit a home run with this deal with S.J. Global. And so if there were going to be losses, which I don't think that they anticipated because they believed – I mean if he anticipated losses such as the FAPRAN's case, that means he anticipated fraud, which would make him knowledgeable. It would prove Judge Walker's point. What's the knowledge that Ramsey had is, well, if he anticipated being sued for fraud, then he anticipated fraud. Well, you could be sued for breach of contract. And the contract had a broad disclaimer that said that they wouldn't be liable unless a final agreement was executed. And so it's clear that they – Ramsey believed that that – Douglas and Ramsey, if you look at the lower court papers, believed that that insulated them from all claims. So anyway, I think that the nature of the business and the fact that Mr. Douglas was in personal bankruptcy and couldn't potentially pay any losses, you know, are additional factors to take into consideration when looking again at this conflict between the intermediate state appellate courts and how these – you know, the federal court has disagreed historically with those appellate courts. Thank you. Thank you. Okay. So Mr. Milnick, can you hear us okay? Yes. Yes. Thank you so much, Your Honor. I really want to appreciate your allowing me to participate in this argument virtually. Again, Stuart Milnick for the appellant, Wesley Ramjeet. A couple things came out during counsel's preliminary argument or opening argument. And, you know, the notion that the allegations involving Mr. Ramjeet were well pleaded, substantiated, and what have you below is completely unfounded. I will also say that the allegation that there was no reasonable expectation of losses was raised for the first time on appeal. It was never considered by the lower court. And even Mr. Douglas himself and his various answers to both the underlying complaint and the amended complaint has admitted there was no partnership. The only involvement that Mr. Ramjeet had, according to the pleadings, was attending one meeting with a fat brand CEO, Andrew Wiederhorn, agreeing to allow PPMT Strategic Group, of which he is the CEO, to act as the administrator and paying agent of any funds that were ultimately received by PPMT Capital. And no funds were received. I mean, for a period of time, it's my understanding that this ended in 2018, Mr. Ramjeet was the CFO of PPMT Capital. And it's not been demonstrated at all that he had any involvement, substantial or otherwise, in connection with the operations of PPMT Capital or knew about what was, you know, going on between Douglas and the so-called SJ Global defendants at all times material. Counsel, can we just be a little more specific on that point? And that is the question, exactly what Ramjeet was aware of. Your adversary has said he was aware of the relative size of the transaction, and I guess the 60 and then the other 40. But he also says there were red flags about the bona fides of that transaction. And I'd like to hear what you have to say about that. My understanding, Your Honor, is that Mr. Ramjeet had very little, if any, knowledge of any of the items or points that you mentioned. I mean, Carl Douglas' business was PPMT Capital. Mr. Ramjeet was not at all involved in that. In the singular meeting he had with Phat and Mr. Wiederhorn, which occurred after the letter of intent was entered into, after the negotiations had begun, and at which, according to plaintiff, it was, you know, Phat came to understand that Mr. Ramjeet was involved in a quote-unquote supervisory role. It just strikes me as incomprehensible, given the fact that all the adverse events that occurred after the singular meeting, that there was no other involvement that Mr. Ramjeet is alleged to have had with Phat Ram's or any of the other defendants. He's not alleged to have any knowledge of or involvement with the SJ Global defendants. He was just – to the extent that he sought to help Douglas, that's really all he did in terms of, you know, enabling him to use the PPMT name. But again, there was no relationship apart from that minor relationship which never came to fruition, acting as the paying agent and the administrator of any fees that were generated by any deals, and none ever were. And so the argument that you're making of the other side's making that they were – that there was sufficient – that they planned sufficiently to have sort of a partnership situation, your response there is that there's no – there just isn't – There was no – there was no partnership. These allegations, Your Honor, respectfully are contrived. There was no – below the plaintiff was a line upon allegations that my client subsidized, helped Mr. – promoted, subsidized, legitimized Mr. Douglas, and that was used as a basis for establishing that there was some sort of agreement to share losses. However, now they're alleging for the first time in appeal that there was never – there was never any loss anticipated or any losses anticipated. Ergo, there couldn't have – that element should not be dispositive as the lower court found that it was. There were also other elements of the partnership which were never considered by the lower court. In their briefs – or in their brief – excuse me, in its brief, I should say, the fact is alleging that apart from this sharing of profits element, all of the other elements reportedly the court found had been established. That's completely untrue. The court didn't have to reach those other elements because it found that the amended complaint failed to allege any agreement on the part of the putative partners, Douglas and Ramjeet, to share losses, which is indispensable to the partnership formation. And from that perspective, Your Honor, hopefully I've answered your question. With regard to the negligent supervision claim, again, there was no employer-employee relationship here. None was ever alleged. The special circumstances simply do not exist. A lot of the activity that's complained of or alleged in the complaint occurred off of the premises of PPMT. PPMT Strategic, PPMT Capital were operating from the same physical location, but there were meetings in Zurich, as you heard about, and other things that occurred. But there's no basis upon which to conclude that Mr. Ramjeet in any way controlled Mr. Douglas, had any knowledge of what Mr. Douglas was doing, or had any reason to believe that this is what Mr. Douglas was doing, nor has one legitimately been alleged. Well, no, there's been an allegation that Ramjeet corroborated his boasts about the royal family's commitment and assets, clearly a falsehood that ties him pretty closely to the scheme. There's an allegation about the way he set up the office and gave the use of the company name and essentially used Douglas as a liability-protected way to propagate this scheme, right? There were allegations that he basically, there was an agreement that if Douglas was able to put together a deal, Ramjeet and his company would come in and perform certain services and get money. Aren't those collectively enough to create some sort of joint enterprise or partnership, joint venture? I don't believe so, Your Honor. Respectfully, we get back to the fact that those arguments are purely speculative, as the lower court concluded correctly. And again, there was no agreement on behalf of the parties to share in losses, notwithstanding this alleged new theory that's come up. And the website, in terms of Mr. Ramjeet's role, it was really administrative. It was to be the recipient of the funds of this company and to be involved with the distribution of those funds. There's no allegations, or actually there were allegations, but there's no fraud claim. But in their brief, the FAT alleges variously that Mr. Ramjeet was purportedly, quote-unquote, actively involved in fraud, engaged in a, quote, a conspiracy with the other defendants, less fraudulent activity. And there is no proof for any of this, nor is there any underlying fraud claim. So these – I think, and I think we've said this in our brief, is that Mr. Ramjeet really matters for one reason. All of the other defendants are overseas. Mr. Ramjeet is here in the U.S. He's a successful businessman and a stranger to the transaction, but he is here. And he's the only one from whom it appears that plaintiffs may ultimately have a chance of collecting, even though there's no basis upon which to, you know, collect against Mr. Ramjeet for the acts of conduct allowed in the complaint. And I think that's pretty much it, unless, you know, the court has further questions. No. Thank you. And thank you again for allowing me to participate this way.  If this fact is true, if this representation was made at one particular meeting, that fact is not good enough to show that Mickey Edison intentionally participated in the furtherance of a common purpose or plan, which is one of the essential requirements that needs to be pled in relation to a civil conspiracy to defraud. That is not enough, that one representation at one meeting, that he may have been a trustee, one of many trustees of the SJ Global Trust, that he had any kind of remote knowledge or remote intention to be part of a common purpose or plan to defraud any of the plaintiffs or the plaintiff. What do we do with the fact that Mr. Edison went to that Zurich meeting and made representations related to this transaction at that meeting? Doesn't that support an inference that he was part of the whole deal? Simply, Your Honour, that he was a participant or present at that meeting, no, is not good enough to show that he was engaged in some kind of a legal activity to be part, even generally part, of a common purpose or plan. But it's a meeting that's specifically about this deal. It's a meeting with Douglas and it's about pulling together the information and there's an allegation that Douglas congratulated him after the meeting for how he conducted himself. There's allegations about the discussions of the deal. Does that not situate him as part of this conspiracy? No, Your Honour, because in the amended complaint, they don't actually say that Mickey Edison attended this meeting. That was raised first time in oral submissions today. Paragraph 23 of the amended complaint says, Upon information and belief, the defendant Mickey Edison conspired with the other SJ Global defendants to harm FAT brands. It then goes on to say, during the relevant time period, Mr. Edison, whose full name is Michael J. Edison, used the alias Mickey Edison to conceal his prior felony convictions. First of all, Mickey Edison is not an alias for Michael J. Edison. It's certainly not an attempt to cover up his identity. All he's done is changed Michael to Mickey. And many people that are named Michael use the name Mickey. It then says, during the relevant time period, Mr. Walsh, Mr. Samuel and Ms. Fields represented that Mickey Edison was one of the trustees of the SJ Global Trust. It does not say anywhere that this representation occurred at a meeting at Zurich and that Mickey Edison in fact attended a meeting at Zurich. Nowhere in the amended complaint does it say that. So I must be looking at an older version of the complaint. You're saying that those allegations were there in an earlier version of the complaint and then came out in an amended complaint? Well, we only looked at the amended complaint because that was the final version in the lower court. Paragraph 23 of the 133? Paragraph 23 is what you're talking about? Paragraph 23 of the amended complaint, yes. And then if you go to paragraphs 187 to 189 of the amended complaint, it then says that after the Zurich meeting, FAT discovered that Mickey and Deborah Edison were truly Mickey and Deborah Edison. Two US felons convicted for operating an investment fraud scheme and then conspiring to obstruct justice through the fabrication of documents. Even though in that paragraph it says after the Zurich meeting, it still does not say anywhere there that Mickey Edison in fact was at that meeting. But without knowing what the full nature of that meeting was, even if it is ultimately discovered that Mickey Edison was a participant at that meeting, it's very difficult to infer from that fact alone that he was intentionally, possibly, even possibly, intentionally furthered, was a participant of a common purpose or plan to defraud FAT. The amended complaint outlines in detail Mickey Edison's allegations of the nature of his previous convictions. But none of those antecedents are linked even remotely through the amended complaint to the operations of the SJ Global Defendants. And that means they cannot even remotely relate to any part of Mickey Edison to be intentionally involved in a common purpose or plan to defraud the plaintiff. Now, my friend refers to a case in his reply brief, Walia versus Veritas Healthcare Solutions LLC. And there he places emphasis on the words where it was found, when considering the sufficiency of pleadings of conspiracy, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading. Now, this case that has been raised is very interesting because the facts of this case are very distinct to the facts of this case before your Honours. In that case, the plaintiff was appearing pro se, so the court did give them more leeway because of that capacity. That does not apply to this case. Also in this case of Walia, they did show generally that every single defendant worked for this particular company. And that they were all involved in some kind of illegal activity that this company was perpetrating. In the case of Walia, it was trafficking workers. Nothing has been shown here that's similar in the case of Mickey Edison. That he was somehow working for SJ Global to perpetrate this scheme against FAT. That hasn't been shown here. I mean, they're sort of at the pleading stage. And again, I'm looking at, there's an allegation that as the CFO, he exerted extensive control over SJ Global worldwide and this scheme. And he participated in daily communications with Walsh, as well as Samuel Douglas, in furtherance of this conspiracy. Isn't that, they may not be able to prove that up at the end of the day, but isn't that an allegation that ties him squarely into the conspiracy? No, Your Honour, because none of those allegations relate to Mickey Edison. Nowhere in the amended complaint does it state that he is the CFO of the SJ Global. I'm sorry, I was talking about Fields. You're right. But it does say that he participated in daily communications with Fields and Walsh in furtherance of the conspiracy. That's 37. Isn't that enough to get you there? Paragraph 37, Your Honour, states, On January 29, 2019, Douglas wrote to Edison and Samuel to congratulate them on well-architected negotiation. They don't say what the nature of that negotiation is. I must be looking at, I'm looking in the joint appendix. Can you give me a joint appendix, because I think we must be looking at different complaints. I apologize, Your Honour, I don't have that reference in front of me, but I'm looking at page 37 of the amended complaint. I'm looking at paragraph 37, which is on A136 of the amended complaint. It's page 10. My understanding is that paragraph 37 does not reference Mickey Edison. Am I mistaken about that? I don't believe I'm mistaken about that. My paragraph refers to Mickey Edison. It says Walsh is the managing, if we're talking about the same one, Walsh is the managing director in Fields as a CFO, exerted control over SJ Global, WW, and this scheme, and participated in daily communications with each other, Samuel, Edison and Douglas, in furtherance of the conspiracy. Yes, well that reference is Walsh, right? Well, reference is Walsh. And Mickey Edison is simply just grouped with those other people. Daily communication with Walsh. Yes, it doesn't say what the nature of that communication is. Well, it says it's in furtherance of the conspiracy. Well, furtherance of, I mean, it's, I, that, You're saying it's too conclusory? I'm saying it's too far removed. It's what? It's too far removed to say that Mickey Edison, without even knowing what the nature of those communications are, it's insinuated throughout the entire amended complaint that all these general assertions, including Mickey Edison's past antecedents, his alleged past antecedents, are somehow associated with the, it doesn't even say that they're associated with the SJ Global defendants, yet the plaintiff is asking Your Honours to somehow make a link between Mickey Edison's past alleged antecedents to the operation of the SJ Global defendants, and that link just isn't there anyway. So what about paragraph 128, which is on page 23 of the complaint? It says, On January 27, FAT's CEO met in Zurich with Douglas, so this is somebody from FAT meeting with Douglas and the alleged principals of SJ Global, Peter Samuel, Neil Walsh, Mickey Edison, and his wife Deborah, doesn't both describing him as a principal of SJ Global and putting him at that meeting with Douglas and FAT to discuss this transaction, that's I guess what I'm trying to figure out. You're saying that's not even enough? No, Your Honour, it's not enough. If there's a reference there that he was just at that meeting without any idea of the nature of his involvement at that meeting, and what may have been communicated to the plaintiff, that's not enough. That he was just present at that meeting is not enough, if that's what's being alleged. And Your Honours are required, when looking at this, to take these facts at their highest, and I appreciate that that's your role in this standard of proof, but we're saying here that even these facts, when taken at their highest, they're just not enough to even remotely infer that Mickey Edison had some kind of tie to a common purpose or plan to defraud the plaintiff. The fact that he, if it says there, and I may have missed that paragraph in the amended complaint, if he says, if it does say there that he was at a particular meeting, without any indication of even the general nature of his involvement, no, that cannot be enough. Certainly not for a civil conspiracy to defraud, where there's four additional elements to fraud they have to prove. They have to prove an agreement between two or more parties, they have to prove an avert act in furtherance of the agreement, and the third is the most important, with regard to Mickey Edison, they have to prove the party's intentional participation in the furtherance of a common purpose or plan, and the resulting damage or injury. So his intentional participation in the furtherance of a common purpose or plan, it's certainly not enough that he would just be there amongst many individuals, not knowing the nature of his involvement, and not understanding the capacity of his role, where FAT claimed they're victims of certain conduct. And if you could just, if you could conclude, unless my colleagues have any other questions. I apologise, Your Honour, Your Honours. So, look, there's that representation, that the facts taken at their highest, assuming that they are true, do not show that Mickey Edison was part of a concerted plan, you know, even remotely. At one point in the amended complaint, it says that he was a financial advisor to the SJ Global defendants. Nowhere does it say that he was actually a financial advisor, that he provided any financial advice to the plaintiffs. At one point in the amended complaint, it says that he was, that, yes, that, you know, it outlines his antecedents, it attempts to, whether they're true or false doesn't matter, assuming that they're true, none of that illegal activity was remotely associated with the activity of the SJ Global defendants. It says at one point that representations were made that he was one of many trustees of the SJ Global Trust. Again, that's not enough to sufficiently tie him to the operations of the corporate entities of the SJ Global defendants. It doesn't even say in the amended complaint that he was a trustee, but simply that he was, that it was represented to them that he was one of many trustees. Right, I think we have your argument. Thank you. I'm going to quickly address the Mickey Edison issue and then I'll move back to Ramji. As your honors had pointed out, counsel was mistaken. Paragraph 128 clearly does place Mr. Edison at the meeting at Zurich. The purpose of the meeting in Zurich is laid out in detail in the complaint. FAPRAN was growing very suspicious because the funding didn't happen. Now the funding isn't coming from the Royal Alfani family. It's coming from some people, SJ Global, who are these people. And at the meeting, Mr. Walsh, Mr. Samuel, and Mr. Edison presented themselves jointly as the persons that controlled this $50 billion trust that nobody really seems to dispute. It never existed. That's a fraud. And if Mr. Edison was innocent and had no knowledge of that, an innocent person would say, no, I'm not a trustee of this trust that doesn't exist and doesn't have $50 billion. That's sufficient to connect him to the conspiracy. Now let's get to the arguments by Mr. Ramji. He admits that he was present at a meeting at which FAPRAN and Mr. Douglas met. Mr. Douglas said, you know, you're going to get your funding from the Royal family of Qatar. That's kind of going to Royal Gulf Capital. The complaint also alleges, and the briefs also allege, that Mr. Ramji knew that the funding was switched to SJ Global. And did not learn that until January. In fact, if you look at page 15 of the reply brief, it talks about, at the bottom of that page, we talk about the, it summarizes neatly all the allegations of his knowledge and participation. Amended complaint paragraph 224 to 225, on an almost daily basis, Ramji discussed with Douglas and owner Tatley Adam the status of PPMT's efforts to raise up to a billion dollars in funding through SJ Global. Wesley Ramji was an accounting and business advisory expert. He operated an SEC registered company. And he should have said to himself, when FAPRAN eventually found out who SJ Global was, or SJ Global was a source of funding, who is SJ Global that's going to introduce a billion dollars and can make me very wealthy? If he had started to conduct the most bare minimal investigation as a financial professional, as he probably was obligated to do, know your customer, anti-money laundering concerns, and so forth, he should have conducted the most basic of investigations to determine whether this stuff was true. Now, we would have to depose Mr. Ramji and find out exactly what he learned during those conversations. But just the fact that this $50 billion trust, or $8 billion trust, or whatever story they told at different points in time, never existed. And he knew months earlier, and had regular conversations about it, that this amount is sufficient, given his financial sophistication, to put him on notice. And his role was not just administrative. His role was to legitimize Carl Douglas. And that's why he appeared at meetings with Carl Douglas. That's why his image appeared on the Carl Douglas website. And he was, therefore, copy on all this correspondence back and forth between FAPRANs and PPMT. So FAPRANs believed the money was coming from the Alfani family up until January. Mr. Ramji was copied on that correspondence, and the complaint alleges he knew something else was happening long before then, and that the money was coming, allegedly, from these SJ Global folks. Who are they? A billion dollars. And they had backed out of other deals that they hadn't funded through PPMT as well. And the last point that I'd like to make on the issue of the losses, Mr. Ramji's counsel said that there were losses anticipated, but I still, no one's ever articulated what they were. There's still not an identification of a specific contract, a specific financial obligation, which existed in many of the other cases. He hasn't indicated that he had any concern that Douglas was committing fraud, and that would create a liability. Can I just ask you, though, this wasn't raised by you below, this claim about no reasonable expectation of losses? We believe that we raised the argument that because Douglas was in bankruptcy and couldn't cover the losses, that the element was satisfied. We didn't cite to the first part, intermediate first department cases. Not just setting the cases, you didn't frame it specifically as the parties. There was no reasonable expectation of losses. Correct. We argued below that because Douglas was in bankruptcy, that only Ramji could cover the losses. But it is proper to raise a legal argument on appeal. Okay. Do you have any other questions? No. All right. Thank you. Thank you to both parties. So that concludes the cases on our argument calendar for today. So I'd like to thank all the parties who argued, thank our court staff, marshals, everyone who helps keep things running smoothly. And I believe with that, we are ready to adjourn. Thank you. Court is adjourned. Thank you.